UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
NICHOLE ADAMS-FLORES
individually and on behalf of all others similarly situated,

Plaintiff,

Case No. 18-CV-12150(JMF)

-against-

PLAINTIFF'S THIRD
AMENDED COMPLAINT
WITH JURY DEMAND

THE CITY OF NEW YORK, HEALTH
& HOSPITAL CORPORATION, CYNTHIA
BRANN, Commissioner of Dept. of Corrections,
PATSY YANG, Chief Operating Officer of Correctional
Health Services, ROSS MACDONALD, Chief of Medicine,
JEFF THAMKITTIKASEM, Former Chief of Staff of Dept.
of Corrections, and MARTIN MURPHY, former
Chief of Department of Dept of Corrections.

Defendants.
------------------------------------------------------------------------X


       NICHOLE ADAMS-FLORES, by and through her attorneys, the LAW OFFICES OF

FREDERICK K. BREWINGTON, as and for her Third Amended Complaint by grant and Order of

the Court (ECF 70) , against the Defendants, the City of New York, Health and Hospitals

Corporation, Cynthia Brann, Commissioner, Patsy Yang, Chief Operating Officer of Correctional

Health Services, Ross MacDonald, Chief of Medicine, Jeff Thamkittikasem, Former Chief of Staff,

and Martin Murphy, former Chief of Department (collectively, "Defendants") states and alleges as

follows:

<b><u>PRELIMINARY STATEMENT</u></b>

1.    This action is hereby commenced for the purpose of seeking to secure protection of, and to

redress the deprivation of rights secured and protected by the United States Constitution, Title VII

of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 1983,  New York State Executive Law §§ 296, et seq. and the New York City Human Rights Law, N.Y.C. Administrative Code §§ 8-107, et seq., providing for relief from the above-captioned Defendants' unlawful employment practices of engaging in discrimination based upon Plaintiff's race, color and national origin, pregnancy, gender, for retaliation against Plaintiff for engaging in the protected activity of formally complaining of said discrimination, and the creation of a hostile work environment which Plaintiff was forced to endure. This action also seeks to vindicate the rights of Plaintiff, an African American Executive Staff of the New York City Department of Corrections ("DOC") who was subjected to adverse employment conditions based upon her race and color, gender, pregnancy while at the Health and Hospitals Corporation,  as well as her staunch refusal to engage in the prevalent corruption, falsification  and manipulation of data  within Rikers Island, for which the Plaintiff suffered a disparate impact when compared with similarly situated non-African American employees.

2.     Specifically, the Plaintiff alleges that the collective Defendants engaged in discrimination and retaliation and negligently, wantonly, recklessly, intentionally and knowingly sought to and did wrongfully deprive Plaintiff of the appropriate employment position and title and pay through acts that were taken against Plaintiff because of her race, color, and national origin, sex, pregnancy, and for retaliation against Plaintiff for opposing discrimination. These acts resulted in misrepresentation, misinformation, harassment, character assassination, negative impact regarding Plaintiff's, humiliation, embarrassment, depravation of job opportunities, permanent injury and harm and other results which continue to mount.

3.     As set forth more fully below, Plaintiff alleges in this action that Defendants the City of New York ("City") and Health & Hospital Corporation, the individually-named Defendants, as current

and former DOC Executive Staff, have engaged in a pattern and practice of race and pregnancy discrimination and retaliation based upon, inter alia: 1) failure to provide Plaintiff, an African American supervisor with the appropriate equipment and resources that were provided to similarly-situated, non-African American employees; 2) the marginalization of Plaintiff by Defendants; and 3) the disparate impact upon the Plaintiff, an African American, who refused to take part in the systemic corruption and falsification tactics undertaken by Defendants.

4.      For years, Defendants have engaged in a pattern and practice of systemic, continuous, and intentional discrimination against African American administrative and management employees in job placement, advancement opportunities, and compensation decisions. Defendants have denied African Americans the same advancement opportunities as have been afforded to non-African Americans. This broad pattern of racial discrimination has resulted in a far less percentage of African American Executive Staff members at the DOC as compared to other City government agencies.

5.      Despite repeated attempts by Plaintiff, and other similarly situated African American supervisory employees to: 1) curtail this severe and pervasive discrimination, and 2) remedy the falsification and manipulation of facts, especially regarding access to medical services and receipt of medical treatment by detainees and inmates within Rikers Island, and despite the reporting of the repeated instances of discrimination, abuse and corruption to her supervisors, the Office of Equal Employment Opportunity, and DOC Executive Staff, Defendants utterly failed to take appropriate corrective actions and permitted the hostile work environment to persist unabated during her employment.

6.      The African American Executive Staff members all suffered a similar fate, like Plaintiff when she voiced her concerns to Defendants: their complaints were wholly ignored, their authority

and decision-making responsibilities were minimized, their information, level of access, fiscal, and personnel resources were severely restricted, and/or their voices were was completely stifled. Plaintiff, and other African American Executive Staff members were  constructively dismissed, forced off the job, forced to resign and/or endure a retaliatory and hostile work environment.

7.    Plaintiff alleges that the collective Defendants, directly acted and/or allowed its agents, employees, representatives and/or officers to act maliciously and unconstitutionally, enacting discriminatory policies, which caused Plaintiff  to suffer the following injuries:

-       Violations of her various statutory rights, including those protected by the Title VII of the Civil Rights Act of 1964, Article 15 of the Executive Law of the State of New York (Human Rights Law) §§ 290 and 296, N.Y.C. Administrative Code §§ 8-107, et seq.;

-       Violations of her Constitutional rights under the Fourteenth Amendment to the United States Constitution (Fourteenth Amendment) in violation of 42 U.S.C.  § 1983;

-       Complete, temporary, or partial loss of reputation;

-       Loss of benefits and pay;

-       Prolonged alteration of employment and/or temporary/partial alteration of  employ m e n t opport unities; and

-       Diminished capacity, incurring special, monetary, and compensatory damages.

-       Serious and permanent emotional injury and distress, loss of standing in the

4

community and loss of self worth.

8.    Said acts were done knowingly with the consent and condonation of THE CITY OF NEW

YORK, HEALTH & HOSPITAL CORPORATION, CYNTHIA BRANN, Commissioner of Dept.

of Corrections, PATSY YANG, Chief Operating Officer of Correctional Health Services, ROSS

MACDONALD, Chief of Medicine, JEFF THAMKITTIKASEM, Former Chief of Staff of Dept.

of Corrections, and MARTIN MURPHY, former Chief of Department of Dept of Corrections with

the express purpose of targeting, injuring and silencing the Plaintiff, and generally violating her

rights as protected by the United States and New York State Constitutions, and federal and state

statutes, rules and regulations.

9.    Plaintiff brings this action on behalf of herself for practices of discrimination based upon

race, gender, and pregnancy, which violates Title VII, 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1983,

Section 296 of the New York Executive Law, and Section 8-107 of the New York City

Administrative Code.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over Plaintiff s Federal claims pursuant to 28 U.S.C. § 1331 and

42 U.S.C. §§ 2000e-5(f)(1 ), 5(f)(3) and supplemental jurisdiction over the state and city law claims

pursuant to 28 U.S.C. § 1367.

11.    As the Southern District is the District wherein a substantial part of the events giving rise to

the instant claims occurred, venue is proper pursuant to 28 U.S.C. § 1391(a)(2).

12.    Plaintiff filed Charges of Discrimination with the Equal Employment Opportunity

Commission ("EEOC") complaining of race and color, disability and gender discrimination,

retaliation, and creation of a hostile work environment, inter alia, as further alleged in this

5

Complaint.

13.     On September 26,  2018, Plaintiff received two Notices of Right to Sue issued by the U.S. Equal Employment Opportunity Commission with regard to EEOC Charge Nos. 520-2017-02495 and 520-2018-02104.  Those Notices were dated September 21, 2018, but were postmarked on September 24, 2018.  As of the filing of the original complaint on December 24, 2018, ninety days from the date of receipt of the Notices of Right to Sue had not yet passed. (See Exhibit A)

PARTIES

14.     Plaintiff Nichole Adams-Flores is an African-American woman, and served as  a Clinical Supervisor for the Health and Hospitals Corporation of New York  at Riker's Island from 2014 to February 2016 (hereinafter H&H or HHC) and then Deputy Commissioner for Health Affairs of New York City Department of Corrections Department of Correction (hereinafter DOC) from February 2016 to March 2019.  As Deputy Commissioner of Health Affairs, Plaintiff, among other duties, was responsible for oversight, directing and managing the planning, development implementation of programs and health care services to the inmate population. Plaintiff was expected to develop and implement a wide range of planning initiatives for the department's operations, and was responsible for managing the planning, development and implementation of programs and health care services to the inmate population..

15.     In many respects, Plaintiff's position at DOC was a continuation of the duties and responsibilities of her position at HHC. During the course of her employment at DOC, Plaintiff was also required to work collaboratively with NYC Health & Hospital Corporation (H&H) which delivers and oversees the medical care of the inmates in the DOC's custody.  As such, Plaintiff was the first point of contact and direct liaison between H&H and DOC.

16.     The City of New York ("City") was and is a municipality of the State of New York.  Upon information and belief, the CITY oversees, maintains, manages/supervises, and controls several departments, agencies and employees- including but not limited to the DOC, the HHC, CYNTHIA BRANN, PATSY YANG, ROSS MACDONALD, JEFF THAMKITTIKASEM, and MARTIN MURPHY, and was and is the employer of members of the DOC and HHC. CITY is an employer within the definition of the New York State Executive Law, Title VII and the New York City Human Rights Law and employs well over 15 employees. City is a municipal corporation existing by the virtue of the laws of the State of New York. The City, through the Department of Corrections ("DOC") and HHC, maintains a policy and practice of discrimination against African American employees, including the creation of a disparate impact against the African Americans.

17.     The City is liable for the discrimination suffered by Plaintiff and similarly situated African American employees.

18.     Defendant Cynthia Brann is a white female and was named Commissioner of the DOC in October 2017 and sued here in her individual capacity. Prior to her appointment, Defendant Brann served as the Deputy Commissioner of Quality Assurance and Integrity for the DOC. At all times relevant herein, Defendant Brann served under the executive direction of former DOC Commissioner Joseph Ponte.

19.     Defendant Brann was responsible for reviewing and evaluating compliance issues within the DOC and ensuring that subordinate supervisory staff, management, and employees were in compliance with the rules and regulations of regulatory agencies, including but not limited to the Federal government oversight implemented by the United States Attorney's Office for the Southern District of New York, and the DOC's policies and procedures. Defendant Brann was also

responsible for responding to alleged violations of DOC rules, regulations, policies, procedures, and standards of conduct by evaluating and/or recommending the initiation of investigative procedures, developing and overseeing a system for handling compliance violations, and monitoring and coordinating compliance activities.

20.     It is alleged herein that Defendant Brann was acting in furtherance of the scope of her employment, acting under color of law, to wit under color of statutes, ordinances, regulations, policies, customs and usages of the State of New York and/or the CITY OF NEW YORK, and willfully, wantonly and/or negligently failed to carry out the aforementioned duties and responsibilities, thereby resulting in the existence and proliferation of a pattern and practice of race and color discrimination, retaliation, and hostile work environment within DOC, including disparate impact.

21.     Defendant Patsy Yang is an Asian American female and at all relevant times is the Senior Vice President of Correctional Health Services for HHC and sued here in her individual capacity. As V.P. of Correctional Health Services at HHC, she is responsible for  and has influence over all medical and mental health services and the health care operations that are implemented at DOC, including Plaintiff's duties and responsibilities at DOC.

22.     Specific to the allegations contained herein of discrimination, including disparate impact, Defendant Yang, and/ or her designee and/ or her title was responsible for reviewing and evaluating health care issues and communicating those concerns to the Deputy Commissioner for Health Affairs (Plaintiff) during the course of Plaintiff's employment at DOC.  This was defendant Yang's past practices with the previous Deputy Commissioner for Health Affairs, who was a white male. Defendant Yang was also responsible for addressing alleged violations of health care practices and

communicating those concerns to the DOC via Plaintiff, who, as Deputy Commissioner for Health Affairs, was the DOC designee for such communications.

23.    It is alleged herein that Defendant Yang was acting in furtherance of the scope of her employment, acting under color of law, to wit under color of statutes, ordinances, regulations, policies, customs and usages of the State of New York and/or the CITY OF NEW YORK, and willfully, wantonly and/or negligently failed to carry out the aforementioned duties and responsibilities, thereby resulting in the existence and proliferation of a pattern and practice of race and color discrimination, retaliation, and a hostile work environment within DOC, including disparate impact.

24.    Ross MacDonald is a white male who is the Chief Medical Officer of Correctional Health Services, a position he has held since June of 2017 until present, and sued here in his individual capacity. Prior to this role, he served as Chief of Service for Correctional Health Services from August 2015 until June of 2017.

25.    As Chief Medical Officer, Defendant MacDonald has direct supervisory oversight for medical and mental health service delivery. Defendant MacDonald communicates relevant information to support the care and treatment of detainees to appropriate DOC staff, namely, Plaintiff, in her role as the Deputy Commissioner for Health Affairs, consistent with past practice.

26.    It is alleged herein that Defendant MacDonald was acting in furtherance of the scope of his employment, acting under color of law, to wit under color of statutes, ordinances, regulations, policies, customs and usages of the State of New York and/or the CITY OF NEW YORK, and willfully, wantonly and/or negligently failed to carry out the aforementioned duties and responsibilities, thereby resulting in the existence and proliferation of a pattern and practice of race

and color discrimination, retaliation, and a hostile work environment within DOC, including disparate impact against Plaintiff.

27.     Jeff Thamkittikasem is an Asian American male who was the Chief of Staff of the DOC, a position he has held since November 2014 to 2018 per assignment from Mayor Bill de Blasio, despite having no prior corrections experience and is sued here in his individual capacity.

28.     As Chief of Staff, Defendant Tharnkittikasem acted as the Commissioner Defendant Brann's representative to the uniformed Command Staff, the members of DOC's Executive Staff and to external personnel within HHC, specifically Defendant Patsy Yang. Defendant Thamkittikasem advised the Commissioner Defendant Brann on program and policy matters, managed high priority projects, and oversaw the day to-day operations of the Office of the Commissioner which includes the Health Affairs Division of DOC.

29.     It is alleged herein that Defendant Thamkittikasem was acting in furtherance of the scope of his employment, acting under color of law, to wit under color of statutes, ordinances, regulations, policies, customs and usages of the State of New York and/or the CITY OF NEW YORK, and willfully, wantonly and/or negligently failed to carry out the aforementioned duties and responsibilities, thereby resulting in the existence and proliferation of a pattern and practice of race and color discrimination, retaliation, and a hostile work environment within DOC, including disparate impact against Plaintiff.

30.     Martin Murphy is a white male and was the Chief of the Department of the DOC from February 2015 until June 2017 when he retired and is sued here in his individual capacity.

31.     As Chief of the Department, Defendant Murphy supervised the uniformed members of service in the DOC, including Assistant Chiefs, Wardens, Deputy Wardens-In-Command, Deputy

Wardens, Assistant Deputy Wardens, Captains, and Correction Officers. Defendant Murphy also was responsible for approving promotions and job assignments of the uniformed staff throughout the DOC.

32.     Specific to the allegations contained herein of discrimination, including disparate impact, Defendant Murphy was responsible for reviewing and evaluating compliance issues within the DOC and ensuring that subordinate supervisory staff, management, and employees were in compliance with the rules and regulations of regulatory agencies, including but not limited to the Federal Government oversight implemented by the United States Attorney's Office for the Southern District of New York, and the DOC's policies and procedures. Defendant Murphy was also responsible for responding to alleged violations of DOC rules, regulations, policies, procedures, and standards of conduct by evaluating and/or recommending the initiation of investigative procedures, developing and overseeing a system for handling compliance violations, and monitoring and coordinating compliance activities.

33.     It is alleged herein that Defendant Murphy was acting in furtherance of the scope of his employment, acting under color of law, to wit under color of statutes, ordinances, regulations, policies, customs and usages of the State of New York and/or the CITY OF NEW YORK, and willfully, wantonly and/or negligently failed to carry out the aforementioned duties and responsibilities, thereby resulting in the existence and proliferation of a pattern and practice of race and color discrimination, retaliation, and a hostile work environment within DOCS, including disparate impact against Plaintiff.

## INTRODUCTORY ALLEGATIONS

34.     At all relevant times, the DOC was an agency for the City of New York comprised

11

approximately ten thousand four hundred (10,400) employees, eighty (80) of which were administrators and managers.

35.     The supervisory positions of administrators and managers are divided into uniformed titles and civilian titles.

36.     The uniformed titles include Chief of Department, Warden, Deputy Warden-In-Command, and Deputy Warden, inter alia.

37.     The civilian titles include Commissioner, First Deputy Commissioner, Deputy Commissioner, Associate Commissioner, and Assistant Commissioner.

38.     The Executive Staff is comprised of the Commissioner, First Deputy Commissioner, Senior Deputy Commissioner, Chief of Staff, Deputy Commissioner of Financial, Facility and Fleet Administration, Deputy Commissioner for Legal Matters/General Counsel, Deputy Commissioner of Public Information, First Deputy Commissioner of Human Resources, Deputy Commissioner of Youthful Offender and Young Adult Programming, Deputy Commissioner for the Office of Classification and Population Management, Deputy Commissioner of Adult Programming and Community Partnerships, Deputy Commissioner of Quality Insurance and Integrity, Chief Information Officer/Deputy Commissioner of Information Technology, Deputy Commissioner of Health Affairs, and Deputy Commissioner for Investigation Division.

39.     At all relevant times, a disproportionally low percentage of DOC's African American employees were afforded the opportunity of obtaining Executive Staff positions.

40.     Unlike non-African American supervisors, the few African Americans who do hold supervisory positions at DOC have their authority circumvented, marginalized, and usurped, are denied promotions and the opportunity to move up in the ranks, and/or are threatened with demotion

if they fail to resign.

41.    A New York City Government Workforce Profile Report shows that, at times relevant to this Amended Complaint, "Black" employees held only approximately thirty (30%) of the managerial positions within the DOC, despite over seventy-five percent (75%) overall "Black" employment.

42.    The racially discriminatory culture, policies, and practices that have caused the DOC to under-promote and marginalize African Americans has resulted in systemic and continuing racial discrimination, including disparate impact, in hiring, advancement, and pay decisions against African Americans employed by the DOC, including but not limited to Plaintiff.

## FACTUAL ALLEGATIONS

43.    Plaintiff, Nichole Adams-Flores has earned multiple degrees, including a Doctorate of Psychology in School/Community Psychology- Hofstra University May 2004; Master of Science in General Psychology- Hofstra University December 1999; Master of Arts in Administration and Supervision- Touro College December 2005; Master of Arts in Counseling Psychology- Howard University May 1998; and a Bachelor of Science in Psychology- Howard University May 1996. She received Board Certification from the American Board of Professional Psychology in 2013. She is a Licensed and Registered Psychologist and teaches both graduate and undergraduate students in Psychology since 2008.

44.    In addition to her academic accomplishments and degrees, upon being hired by HHC and then DOC Plaintiff added a level of expertise that opened doors and opportunity for the City and DOC, including, inter alia, bringing in funds to support HHC's and DOC's program.

45.    Plaintiff authored a Mental Health Collaboration Grant funded by the Department of Justice, which awarded NYC DOC $250,000 to work in conjunction with HHC to develop and implement

13

novel mental health programs to address the trauma experienced by many of the most vulnerable inmates that carry a designation of Seriously Mentally Ill.  This was another first for the DOC,  due in large part to the work of the Plaintiff.   The grant also allowed for the development of stronger community ties for NYC DOC, especially with the United Nations, who were active members of the advisory board for this grant initiative, and had planned to take the work product of the grant to create and drive practice for corrections staff internationally.

46.     When the Plaintiff was unfairly and illegally dismissed by Commissioner Brann, this retaliatory act abruptly ended the work of this grant, before the designated grant ending period, jeopardizing the ability of the Plaintiff to receive grant funding from Department of Justice in the future and further harming the reputation of NYC DOC in the academic community at large, tearing down the carefully built reputation of NYC DOC becoming leaders in the national and international correction's community.

### BACKGROUND FACTS AND PROTECTED ACTIVITY: PLAINTIFF'S EMPLOYMENT WITH HHC DISCRIMINATION AND DENIAL OF ACCOMMODATIONS

47.     Plaintiff began working as a Clinical Supervisor at Riker's Island in 2014.  At that time, Plaintiff was employed by Corizon, a private provider of health care for jailed and detained persons and was hired by then DOC Commissioner Joseph Ponte.  As detailed below, Plaintiff was working on DOC programs from the very beginning of her employment.

Plaintiff's Work with DOC from 2014 -2015

48.     When Plaintiff was hired by Commissioner Ponte, he explained to her the Plaintiff that he was tired of attending conferences where persons presented about Riker's Island and had facts

and data and he was not aware of how it had been collected. He explained that his vision for the role of the Deputy Commissioner of Health Affairs, among other things, was to present at conferences, both nationally and internationally, so the DOC 'has a voice in the room'.

49.     Commissioner Ponte wanted DOC to have a Corrections expert that could present on a variety of topics and present on DOC data and talking points that were supported and approved by the Commissioner himself. Commissioner Ponte regularly sent the Plaintiff to conferences for which he wanted her to create proposals and present. He reviewed and approved the conference topics and content. The Plaintiff's work resulted in her being appointed to several national and international behavioral health committees.

50.     Plaintiff authored and received approval for the 1st international conference presentation of NYC DOC. Participation in this international event paved the way for DOC to have more international opportunities. Commissioner Ponte attended the Plaintiff's workshop and provided feedback to support and enhance her work moving forward. The Plaintiff, as a representative of NYC and DOC, was also receiving more invitations to present the work of DOC nationally and internationally. One such work, a behavioral resource manual, which was a collaboration of NYC with several other states, was published on the American Correction Association website.

51.     Prior to his untimely retirement in May of 2017, Commissioner Ponte, had already approved several conferences for the Plaintiff to present at, and DOC had already committed to attend with the Plaintiff at the presenter. These events were scheduled for January of 2017 in Florida. Defendants Commissioner Brann and Jeff Thakittikasem canceled these events, even though the Plaintiff's workshops had been committed to, and published in the conference guides, as a further acts of retaliation , after the Plaintiff filed EEOC charges. This further damaged the Plaintiff's

professional credibility, and negatively reflected on NYC and DOC as not able to honor professional

commitments.

52.     On or about December 13, 2015 Corizon lost their contract with NYC and, it was announced,

that HHC would take over medical and mental health services at Riker's Island. This announcement

took place in or about October of 2015. Plaintiff's work, role and responsibilities then became part

of HHC, and plaintiff became an HHC employee.

### The Transition of Plaintiff''s Work from Corizon to HHC: Defendant Yang Exercises Decision-Making Authority over the Terms and Conditions of Plaintiff's Employment

53.     As a part of the process of transitioning from Corizon to HHC, all employees, including

Plaintiff, interviewed with HHC for their current jobs.  Plaintiff was informed that she would

continue her work as a Clinical Supervisor.

54.     When CORIZON was told, by the Mayor, to leave Rikers Defendant Yang was assigned

to manage the 'Correctional Health Services' branch under HHC.  Anything relating to the interface

between HHC and the Correctional Health Services came under her direct and ultimate authority.

55.     Defendant was the person making decisions about Plaintiff's employment and most other

matters relating to the operation and management of the agency.

56.     Just prior to the switch from Corizon to HHC, Dr. Jude Leung became Plaintiff's direct

supervisor. However, while nominally her supervisor, Dr. Leung made few if any decisions

concerning Plaintiff's work status on her own, and instead consulted actively with Defendant Yang

either directly or through Dr. Ford.

57.     Due to the Plaintiff's good work performance, training, background and program

needs, Plaintiff was assigned to work with a specialty testing program unit, which would be the first

16

forensic psychiatric assessment unit on Riker's.  Dr. Leung supervised the specialty program units.

Dr. Leung deferred to Defendant Yang on matters concerning Plaintiff.  She would regularly speak

with Plaintiff and advise that she had to "check with Patsy."

**Plaintiff's Pregnancy: Defendant Yang Denies Reasonable Accommodation and Reduces Plaintiff's Work Hours**

58.      When issues arose with the Plaintiff's pregnancy and work status, Dr. Leung

explained to the Plaintiff that she had no decision making authority with this issue and needed to

"check with Patsy."

59.      In fact, Dr. Leung informed Plaintiff in an email on January 4, 2016 that it was

Patsy Yang, "the Senior VP of Correctional Health Services (CHS) has given final approval for you

to work 20 hours/week from home, effective 12/31/15 until your delivery date."  She informed

Plaintiff that it was Patsy Yang who told her to inform Plaintiff that she  needed to reduce hours, stay

home, and could not work full time.

60.      Before being denied all of her accommodation requests, Plaintiff's Corizon

supervisor, Dr. Mark Fleming, informed her that the work of the Clinical Supervisor could happen

from home.  In fact, Dr. Fleming was in the process of creating a role for the Plaintiff by which she

would work out of the administrative trailer, as clinical supervisor, and perform her work duties

outside of the physical jail setting.  Dr. Fleming was aware that the Plaintiff was pregnant and had

stated that her work could happen from the administrative trailer as her medical condition advanced

or even from home if necessary.

61.      On December 20, 2015, Plaintiff was hospitalized due to complications during her continuing

pregnancy.  She was discharged from the hospital on December 22, 2015.   Prior to that time,

Plaintiff had sought no accommodations or changes in her work environment, duties or requirements. The Plaintiff was placed on medical bed rest following discharge from the hospital and was paid her full salary for approximately 1 week. Plaintiff did not return to full time employment after her hospitalization, even though she had medical clearance, albeit with some restrictions. Defendant Yang informed Dr. Leung to notify the Plaintiff that she could not return to Riker's at all.

62.     On December 22, 2015,  in anticipation of HHC being her new employer (they were replacing Corizon) and then on or about January 1, 2016,  Plaintiff informed Dr. Leung that she needed ..to be placed on medical bed rest due to complications in her pregnancy.  At that time Plaintiff requested that she be allowed to work full time from home, doing all of her essential duties from that location.

63.     In most discussions when Dr. Leung would call Plaintiff , she would say , "We have to check with Patsy."  This was particularly true at the point of Plaintiff's requests to work from home and to be provided accommodations.  This was confirmed in an email sent by Dr. Leung to Plaintiff dated January 4, 2016.

64.     On January 4, 2016, Dr. Leung formally responded to Plaintiff's previous request for accommodations to work and perform her job duties from home and denied her request.  Instead, Dr. Leung informed Plaintiff that according to Patsy Yang, HHC would reduce Plaintiff's work hours to 20 hours a week and reduce her salary by 43%.  This was neither Plaintiff's request nor her intention upon seeking the accommodations which were requested.  At no point did Plaintiff seek or contemplate being reduced to a part time employee.

65.     As justification for the denial, Dr. Leung stated, "we are unable to accommodate your request to work full-time from home, as your position of Clinical Supervisor is one that requires on-site

presence at Rikers."  This was a false statement, inasmuch as Plaintiff's prior supervisor, Dr. Fleming, was in the process of arranging a similar accommodation/work role.

**Plaintiff Protests Defendant Yang's Discriminatory Denial of Reasonable Accommodation**

66.     Plaintiff had to maintain her full time status, and on January 6, Plaintiff voiced her opposition to being made part time and indicated that the reduction would "cut my salary by half which would cause my home to go into foreclosure and prevent me from being able to pay for childcare for my children."  Plaintiff made it clear that she could not withstand any time reduction and pay reduction.

67.     Aafter further consultation with her physician, Plaintiff requested that an alternative accommodation be provided that would allow her to maintain her full time status during the remainder of her pregnancy and planned child birth.

68.     Plaintiff pointed out to Dr. Leung that she was covered by the Pregnant Workers Fairness Act which was adopted by New York City.  Plaintiff proposed that she could perform all of the essential duties of her job from home for a short period of time that she needed bed rest.  In fact, Plaintiff delineated those functions indicating that she would be able to:

- perform supervision of staff

-  write notes in ECW

- review charts

- respond to emails

- review and edit testing results

- participate in staff meetings

19

- provide verbal support and direction during times of crisis and planning.

69.     On January 6, 2016, Plaintiff also pointed out that an employee from Human Resources, Maria Mendez, alluded to the Pregnant Workers Fairness Act and suggested to Plaintiff that there had been accommodations made for other pregnant woman working for HHC to work from home under this provision without reducing their hours.

70.     Plaintiff's request was again denied by Patsy Yang through Dr. Leung.

71.      On January 8, 2016, Plaintiff obtained a note from her physician that she could return to work on January 11, 2016 with the restrictions of "office/desk work only. Limited standing or walking.....No exposure to chemicals/toxins." This permission to return to work as outlined in the doctor's note and information and the note were promptly provided to Dr. Leung on January 8, 2016.

72.     On January 9, 2016, Plaintiff was denied return to work full time by Dr. Elizabeth Ford, and told by email that "H+H and CHS are actively reviewing your situation regarding an on-site return to work and have all of the communication as of yesterday, including your doctors note." Dr. Ford received her direction and information from Defendant Yang. Dr. Leung and Shane Conrad were copied on this email.

73.     In that January 9, 2016 email, not only was Plaintiff's request to return to work and not be changed to part time not granted, but she was told "Please do not come in on Monday as you are not approved at this time to be in the jail facilities."

74.     Plaintiff was forced to accept a reduction of hours to half time and could not work from home.

**Protected Activity: Plaintiff Protests to HHC's EEO Officer**

75.     Plaintiff complained about her treatment to HHC EEO Officer Tania Pierre following the

January 9, 2016 rejection of her request for reasonable accommodation, and asked that both Dr. Ford

and Dr. Leung be spoken to about their denial and refusal to accommodate Plaintiff's detailed and

reasonable requests.

76.     Like Dr. Leung, EEO Officer Pierre was also subject to the direction of defendant Yang. Ms.

Pierre would make no decisions and provide no permission, but instead she also would say, "you

know who I need to check with", (implying Defendant Yang). EEO Officer Piere stated: "I need to

talk to Patsy" before she could respond to Plaintiff.

77.     From the very beginning of Plaintiff's request for accommodations, Patsy Yang was making

the decisions and dictated directly what Plaintiff could and could not do.

78.     After having received no word on her requests, on January 20, 2016 Plaintiff wrote to EEO

Officer Pierre and reiterated that her "goal is to work full time." She proposed that she work at

Rikers, be transported by wheelchair to the unit where she would work and wear a mask to prevent

toxin exposure. This request was not then responded to.

79.     On January 25, 2016 Plaintiff again complained to EEO Officer Tania Pierre and again

related her concerns, and proposed a number of alternative reasonable accommodations. Plaintiff

reported that she had spoken to Dep. Gallagher, a jail administrator. Plaintiff reported that Dep.

Gallagher "explained that he can find [her] a place to work that is consistent with [her] doctor's

requirement." Again, Plaintiff suggested that she could "take a cart and wear a mask in the hallways

to prevent exposure to toxins." Plaintiff also explained how the work requirements and her needs

could be met in terms of IT issues. Plaintiff also proposed an alternative assignment to GRVC with

the primary focus on meeting the needs of the Department and addressing her clear medical needs.

80.     In her email of January 25, 2016, Plaintiff made explicit that she believed she was being

21

denied full time work because she was pregnant: "I feel that the only thing that would allow me to work full time is not being pregnant. I am not sure if that is the intention, but that is my feeling. I feel that if I was not a high risk pregnancy that this would not be happening to me at all."

81.     In violation of applicable law, HHC and Defendant Yang failed to participate in any interactive or cooperative dialog with Plaintiff to achieve reasonable accommodation for full-time work. For every concern raised by HHC Plaintiff proposed fair and reasonable solutions and made it clear that she felt she was being mistreated as she had "personally spoken to all of those [persons involved in the proposed solutions], and am aware of their willingness to offer support, I am not sure why none of the suggestions that I have submitted to work full time can be viable options."

82.     Having no response to her January 25th email, Plaintiff followed up with EEO Officer Pierre on January 26, 2016, asking: "[m]ight you have heard anything yet?" She was told by Ms. Pierre that she would "call you as soon as I hear something."

83.     Having heard nothing back from her multiple attempts to be granted the accommodations requested, on February 1, 2016 Plaintiff informed EEO Officer Tania Pierre, Dr. Leung, and others that she was had no choice but planning to submit her formal resignation.

84.     On February 1, 2016 Plaintiff wrote to Dr. Leung and several others and advised that she was providing her formal resignation.

85.     On February 2, 2016, Plaintiff again contacted Officer Pierre and asked if she had "the green light for full time yet?"

86.     On February, 3, 2016 Dr. Leung sent an email to Plaintiff and others stating that "for this week and next week, Nichole Adams Flores will work and be paid as a full-time clinical supervisor."

87.     Then, on February 8, 2016 after officially resigning and setting her leaving date as February

15, 2016, Plaintiff was granted the accommodations sought back on January 8, 2016 to continue from February 8, 2016 for the next four days until February 12, 2016.

88.      In that letter dated February 8, 2016, signed by EEO Officer Tania Pierre, to add insult to injury, Plaintiff was told that "the Office will continue to monitor the effectiveness of the above approved reasonable accommodation."   In that letter, not only did Defendants, now allow plaintiff to work full time, but, knowing she had resigned, stated that "[y]ou have been approved to work from home during your regularly scheduled hours (37.5 hours per week) on an as needed basis", which was her initial request back in December of 2015.

89.      As a pregnant woman with a high risk pregnancy, Plaintiff was a person with a disability. During her pregnancy, Plaintiff had a medical crisis, that resulted in special medical needs.   As stated above for some period of time Plaintiff requested  reasonable accommodations due to her disability.

90.      The accommodations were reasonable because other staff members, with Plaintiff's same title, were performing the work in the way that Plaintiff was requesting to do her work.   The accommodations were reasonable, because Plaintiff's psychology supervisor, reviewed her plan and stated that it would allow the work to be completed appropriately.

91.      Plaintiff's requests for accommodation to work from an alternative clinical location was reasonable and appropriate, as evidenced by the fact that Defendants allowed many others in similar roles to work from alternative clinical locations.  However, these similarly situated individuals, were not African American and did not require accommodation of a disability.

92.      Other clinical supervisors who were white or non-black were allowed to perform their duties at HNC by Defendant Yang from alternate clinical locations and did not have to physically remain

on the unit.   Other clinical supervisors who did this work, the way as was being requested by Plaintiff,  included but were not limited to:

-Dr. Valerie Camerano, a white woman, a clinical supervisor, with the title clinical supervisor was allowed to work from an office in an administrative wing at the work location for an entire workday, only visiting inmate units on an as needed basis, if at all.  Ms. Camerano's duties were similar to Plaintiff's in that  she was supervised by Dr. Leung. On information  and  belief,  Ms.  Camerano  did  not  request  this  work  location  as  an accommodation for any disability.  Ms. Camerano is similarly situated to Plaintiff because she held the same title as Plaintiff.

-Dr. Sofia Geogioulos, a white woman, a clinical supervisor, with the title clinical supervisor was allowed to work from an office in an administrative wing at the work location for an entire workday, only visiting inmate units on an as needed basis, if at all.  Ms. Geogioulos' duties were similar to Plaintiff's in that  she was supervised by Dr. Leung. On information and belief, Ms. Geogioulos did not request this work location as an accommodation for any disability.  Ms. Geogioulos is similarly situated to Plaintiff because she held the same title as Plaintiff.

-Dr. Kalim Alcover-Pabon, a white man, a clinical supervisor with the title clinical supervisor was allowed to work from an office in an administrative wing at the work location for an entire workday, only visiting inmate units on an as needed basis, if at all.  Ms. Alcover-Pabon's duties were similar to Plaintiff's in that  she was supervised by Dr. Leung. On information and belief, Ms. Alcover-Pabon did not request this work location as an accommodation for any disability.  Ms. Alcover-Pabon is similarly situated to Plaintiff

because she held the same title as Plaintiff.

-Dr. Kathy Messineo,  a white woman, a clinical supervisor with the title clinical supervisor was allowed to work from an office in an administrative wing at the work location for an entire workday, only visiting inmate units on an as needed basis, if at all.  Ms. Messineo's duties were similar to Plaintiff's in that  she was supervised by Dr. Leung. On information and belief, Ms. Messineo did not request this work location as an accommodation for any disability.  Ms. Messineo is similarly situated to Plaintiff because she held the same title as Plaintiff.

-Dr. Cindy Ho,  an Asian woman, a clinical supervisor with the title clinical supervisor was allowed to work from an office in an administrative wing at the work location for an entire workday, only visiting inmate units on an as needed basis, if at all.  Ms. Ho's duties were similar to Plaintiff's in that  she was supervised by Dr. Leung. On information and belief, Ms. Ho did not request this work location as an accommodation for any disability.  Ms. Ho is similarly situated to Plaintiff because she held the same title as Plaintiff.

93.     Each of the above-listed comparators, like Plaintiff, had duties that could be performed in an admisitrative wing outside of the jail facilities.  Each of the above listed comparators, had a title, duties, and supervisory structure similar to Plaintiff.  Each of the above-listed comparators differ from Plaintiff only because they are not African-American, and, on information and belief, had not persistently sought accommodation for a disability and accommodation for pregnancy, and had not protested to EEO when such accommodation was not forthcoming.

94.     Only after her resignation did Patsy Yang and HHC reversed their position and state that Plaintiff could work from home full time.

95.     Defendants HHC and Yang engaged in intentional discrimination against Plaintiff by denying her reasonable accommodations for her disability and pregnancy, by ignoring her protests to EEO, and giving preferential treatment with regard to work location to similarly situated persons who were not African-American and who had not sought reasonable accommodation or protested to EEO.

96.     At time of her resignation, Plaintiff, Dr. Leung, and  EEO Officer Pierre all knew that    Defendant   Yang   was   making   decisions   about   Plaintiff's   requests   for   reasonable accommodations and that Defendant Yang had initially denied her request for accommodation at HHC. Plaintiff feared retaliation by Defendant Yang.

97.     In an act of power, control and to heighten Plaintiff's anxiety, after Plaintiff made the announcement that she was resigning and going to work for DOC, it was then, and only then that defendant, Yang reversed her decision, making a meaningless decision to grant Plaintiff permission to work from home, because her transfer to DOC was imminent.

**Plaintiff is Transferred from H&H to DOC: Defendant Yang Retains Her Authority over Plaintiff and Functions as Plaintiff's De Facto Supervisor**

98.     The transfer from H&H to DOC was handled by Defendant City and was a transfer from one New York City Agency to another.

99.     On or about January 29, 2016, Plaintiff was offered the position of Deputy Commissioner for Health Affairs at the Department of Corrections.  At that time, Plaintiff came to learn, and was concerned that this job might place her in the position of being a direct liaison for DOC with Defendant Patsy Yang and all Health Services on Riker's Island.

100.    After Plaintiff resigned from HHC, it was confirmed that Plaintiff would be appointed as the

Deputy Commissioner for Health Affairs for DOC. It was also confirmed that this title was the Department of Correction designated liaison to interface with the Senior Vice President for Correctional Health Services, who was Patsy Yang.

101.    In February 2016, Plaintiff left HHC and began working at DOC as the Deputy Commissioner of Health Affairs. Plaintiff was required to work collaboratively with HHC which oversees the medical care of the inmates in the DOC's custody. As such, Plaintiff was the first point of contact and direct liaison between HHC and DOC which, as feared, required Plaintiff to interact directly with Defendant Yang.

**Plaintiff Protests to DOC EEO About her Fears of Defendant Yang: Yang Retaliates**

102.    In or about February 4, 2016 during the processing of the transfer of Plaintiff from H&H to DOC, Plaintiff communicated with DOC EEO to complain about her fear of retaliation. Plaintiff raised concerns as to why her salary was reduced and how her treatment by Defendant Yang at HHC would impact her work and position with DOC.

103.    In or about February 23, 2016 Human Resources at DOC processed Plaintiff's transfer paperwork and at that time encouraged Plaintiff to take a Civil Service Examination as soon as possible. They explained to Plaintiff that her current job was an appointed position and that she needed a civil service title to have some form of job security.

104.    As a result of Plaintiff's protected activity of complaints against Defendant Yang's denial of reasonable accommodation while Plaintiff was at HHC, Defendant Yang began to retaliate against Plaintiff by diminishing Plaintiff's role as the Deputy Commissioner of Health Affairs at DOC. Both Defendant Yang and Defendant MacDonald would limit their interactions with Plaintiff and not communicate with Plaintiff directly regarding inmate health issues at Rikers Island.

27

105.    Prior to Plaintiff being appointed Deputy Commissioner, Patsy Yang's direct liaison was the

DOC Chief of Staff, Jeff Thamkittakisem (Asian Male) and Chief Martin Murphy (White Male), and

a later time Timothy Farrell (White male).

**Defendant Yang Discriminates and Retaliates Against Plaintiff By Refusing to Deal Directly
With Plaintiff**

106.    After Plaintiff took on the position of Deputy Commissioner, even after Defendant Yang was

directed by numerous persons including the Chief of Staff, the Chief of Department of Correction

and the then Commissioner to come to Plaintiff first to deal with all health related matters, in an act

of further discrimination and retaliation, Defendant Yang refused to do so.  This was a continuation

of the discrimination previously shown towards Plaintiff by defendant Yang due to her race,

pregnancy, disability and protests of discrimination.

107.    In addition, while Defendant Yang was respectful and engaged in    meaningful professional

interactions with all white staff members at DOC the same was clearly not true in dealing with

Plaintiff.  Defendant Yang's email communications with the Chief of Department and other white

Deputy Commissioners were timely and professional.  These comparators include:

-    Heidi Grossman, Deputy Commissioner, in executive leadership;

-    Timothy Farrell, Deputy Commissioner, in executive leadership;

-    Martin Murphy, Chief of Department, in executive leadership;

-    Brian Sullivan, Assistant Chief, in executive leadership;

-    Jeff Thamkittakisem, Chief of Staff, in executive leadership.

108.    By contrast, Defendant Yang's tone in her emails to Plaintiff and comments to Plaintiff

while on conference calls were dismissive and condescending.  Defendant Yang's dismissive and

28

condescending tone and treatment of Plaintiff was noticed on commented on by several

staff members, including but not limited toe:  Chelsea Davis (Mayor's Office),  Rabinah Gaynor

(DOC), Fazal Yussuff DOC) , Nathaniel Bialek (DOC),  and William Barnes (DOC).

109.    Defendant Yang's refusal to engage with Plaintiff in meaningful and professional interactions,

prevented Plaintiff  from being able to do her job effectively.   For example, instead of speaking

directly with Plaintiff, Defendant Yang would go to the Chief of Staff to discuss health related

matters and then the Chief of Staff would call Plaintiff.  This was not the process that had been

determined and set up for how the agencies were to interface.  Yet Defendant  Yang purposefully

ignored that process which was created. Everything that Ms. Yang was contacting the other white

administrators to address, they had to stop their designated jobs, to inform Plaintiff of what the new

request was.

**Defendant Yang Discriminates and Retaliates Against Plaintiff By Excluding Plaintiff from Meetings and from the Exchange of Information**

110.    Defendant Yang excluded Plaintiff from meetings and intentionally withheld information and

excluded Plaintiff from the normal chain of exchange and interaction.  Her mistreatment and

differential treatment of Plaintiff was open and obvious.  No male white persons at Plaintiff's level

were so treated by Defendant Yang.  For example, Defendant Yang did not exclude:

-        Heidi Grossman, Deputy Commissioner, in executive leadership;

-        Timothy Farrell, Deputy Commissioner, in executive leadership;

-        Martin Murphy, Chief of Department, in executive leadership;

-        Brian Sullivan, Assistant Chief, in executive leadership;

-        Jeff Thamkittakisem, Chief of Staff, in executive leadership, and

-       Joseph Ponte, Commissioner, Plaintiff's direct report

from these normal business exchanges and ineractions.  Defendant Yang knew that Plaintiff

could not effectively perform her work without her cooperation. Defendant Yang refused to

engage with Plaintiff as a Deputy Commissioner because she was a Black woman and because

Plaintiff had a prior disability, had requested accommodation for disability and pregnancy, and

complained to EEO about being discriminated against.   This behavior prevented Plaintiff from

being able to do her job.

111.    Defendant Yang continued to hold meetings with DOC white administrators, Warden Barnes

and Jeff Thamkittikasem, and would exclude Plaintiff. Plaintiff only became aware of these meetings

after the meetings have already taken place. Such conduct adversely effected the terms and

conditions of Plaintiff s employment at DOC.

112.    One example of meeting that was not told to Plaintiff concerned a directive by the Board of

Correction to engage in a collaborative Health Care Access initiative with Plaintiff.  That meeting

was a public hearing which was recorded and televised.  Defendant Yang contacted the white male

administrator at DOC, Timothy Farrell, to execute a portion of the work. Plaintiff was never

contacted or included in any communication by Defendant Yang until Yang reported to the Board

of Correction that the initiative was a failure and falsely attributed the failure to the Plaintiff, and

failed to disclose that Plaintiff had never been informed of the initiative was to be completed by her.

**Defendant Murphy Denies Plaintiff a Driver Because of Her Race: Plaintiff Protests to DOC EEO**

113.    On or about April 2016 Defendant Murphy informed Plaintiff that she was not able to have

an officer drive for her, even though other white Deputy Commissioners had officers drive for them.

Defendant Murphy elaborated to Plaintiff that he was informing her, 'as a friend', that when the officer would open the door for her to get into the vehicle that it was like 'Driving Ms. Daisy' and it 'looked bad'. He also said that staff was 'talking about me [Plaintiff]' and he was 'worried I [Plaintiff] would have a problem'.

114.    Defendant Murphy contacted the subordinate of Plaintiff, Captain Nathaniel Bialek, and asked him to report on the activities of the officers in the Health Affairs Division, specifically the officers that were asked to drive for Plaintiff and that worked on the grant that Plaintiff acquired for DOC. No other white Deputy Commissioners had subordinates contacted in their division and were asked to report on their activities.

115.    On or about May 15, 2017 Plaintiff filed an EEO Complaint with DOC.

**Continued Retaliation: Plaintiff is Denied a Permanent Civil Service Title**

116.    In further retaliation for having complained about being marginalized by Defendant Yang, Plaintiff continued to be treated less favorably then her white counterparts by Defendants Brann and Thamkittikasem. The DOC Commissioner and Chief of Staff refused to give Plaintiff a permanent civil service title as the Deputy Commissioner of Health Affairs.

117.    On or about March 2016 Plaintiff took Exam # 6047 000 for Exam Title: "Health Services Manager".

118.    On June 8, 2017 Plaintiff was notified by NYC Citywide Administrative Services that she scored a perfect score of 100% on the exam for Health Services Manager and was given a list number of 187.

119.    On July 15, 2017 Plaintiff received a "Notice of Hiring Pool" from NYC Department of Health and Mental Hygiene (DOHMH) informing her that she was certified by Citywide

Administrative Services to the Department of Health and Mental Hygiene that she was eligible for the permanent position of civil service title "Health Service Manager" and instructions to report to Citywide Administrative Services office.

Defendant Braun Participates in the Discrimination and Retaliation Against Plaintiff: She Refuses to Transfer Plaintiff's Title to DOC

120.    On or about July 21, 2017 Plaintiff requested Defendant Brann to transfer the title of Health Service manager from DOHMH to the DOC on her behalf. Defendant Brann said she needed to follow up with Defendant Thamkittikasem and that Plaintiff's job was an "at will position".

121.    On July 24, 2017 Plaintiff spoke with Deputy Commissioner Human Resource, Nadene Pinnock, about the permanent title of "Health Service Manager" at DOC and was told that there was a budget issue.

122.    Subsequently, Plaintiff was informed by the Deputy Commissioner of Finance, Frank Doka, that the transfer of a permanent title was not a budget issue and Dina Simon, who served as both the former First Deputy Commissioner and Deputy Commissioner of Human Resources for DOC, informed Plaintiff that the awarding of the permanent civil service titles was a standard practice that happens routinely and does not impact incoming administrations and is not within the purview of the Chief of Staff as she was told by DOC HR personnel.

123.    On or about July 26, 2017 Plaintiff went to the Citywide Administrative Services office in Long Island City for an interview.

124.    On July 26, 2017 Plaintiff asked Defendant Brann to complete the form DP-72 to allow the transfer of her  Health Service Manager Title to DOC.

125.    On July 27, 2017 Plaintiff complained and informed EEO that she believed that

32

DOC was retaliating against her by not transferring the Health Service Manager Title, as they had done for other white supervisors.

126.    On July 31, 2017, Defendant Brann informed Plaintiff that she would provide a written response to the request that she execute the DP-72 form.

127.    In an act of clear retaliation, on August 1, 2017 Defendant Brann, after speaking with Defendant Thamkittikasem, sent Plaintiff a letter which stated that she refused to honor Plaintiff's request to 'pick up' the title of Health Service Manager and allow Plaintiff to serve in that title 'on leave'.

128.    White Deputy Commissioners and Assistant Deputy Commissioners (Example: Frank Doka, Patricia Lyons, Joseph Antonielli, and James Walsh) have received the permanent civil service titles in the past and continue to receive them throughout DOC with lesser scores on the exam. All of whom are part of the Executive Leadership branch, consistent with Plaintiff's title.

Defendant Brann Participates in the Discrimination and Retaliation against Plaintiff by Blocking a Press Release Outlining Plaintiff's Accomplishments

129.    On August 1, 2017, a press release was scheduled to be released to outline Plaintiff's accomplishments as Deputy Commissioner.  However, in another act of discrimination and retaliation, Defendant Brann prevented the release and provided and order to the  public information personnel that the release not be issued.  Commissioner Brann supported press releases for Timothy Farrell and Mike Tausek both of whom were white males.

**Continued Retaliation: Defendants' Fabricated Performance Improvement Plan**

130.    On or about September 15, 2017 EEO sent to Plaintiff a copy of a Word document and inquired of Plain tiff if she had ever seen it before or signed it.  Plaintiff informed

EEO that she had never seen the document before and that she had certainly never signed it. The EEO personnel explained that Defendant Thamkittikasem informed them the document was a performance improvement plan on which Plaintiff had been placed. This was false and a total fabrication.

131.    The fabricated Performance Improvement Plan was Defendants' pretextual attempt to document a basis for its discrimination and retaliation against Plaintiff.

**Further Protected Activity: Plaintiff Files A Complaint with the EEOC; DOC EEO Summarily Closes Plaintiff's Internal EEO Complaint**

132.    On October 1, 2017, Plaintiff filed a complaint with the Equal Employment Opportunity Commission (EEOC).

133.    On or about December 11, 2017, after nearly four months of refusal to do so, the DP 72 to transfer the Health Service Manager title to DOC was signed. No reason or rationale was provided for the sudden change by Defendants.

134.    On or about December 22, 2017, EEO summarily closed Plaintiff's complaint of discrimination and retaliation for not transferring the title to DOC without making a finding if the action to deny Plaintiff's request was improper in the first place. This practice of avoiding making findings on complaints of discrimination and retaliation is, upon information and belief, an ongoing pattern and practice by EEO.

**Defendant Yang Continues to Discriminate and Retaliate Against Plaintiff**

135.    In January 2018 Defendant Yang excluded Plaintiff from a Joint Assessment Review meeting which directly reviews Health Care Case issues on Rikers Island.

136.    In February of 2018 and only after Plaintiff filed an EEO complaint, and the EEO office

34

contacted DOC was Plaintiff finally given her permanent civil service title which protects her position within DOC. However, the title was placed on leave with a 20% decrease in her current salary. Although this was permissible under DCAS rules, no other white Deputy Commissioner had their title and salary decreased when their civil service title was transferred to them.

137.    On or about February 12, 2018, Human Resources sent Plaintiff a Civil Services appointment letter stating that her appointment began on September 11, 2017 which was back dating the appointment by a month before the filing of Plaintiff's complaint with the EEOC.  In so doing, Defendants were falsely attempting to avoid legal responsibility for their discrimination and retaliation against Plaintiff.

**Protected Activity: Inspector General Complaint**

138.    In September 2018 Plaintiff filed a complaint with the Inspector General to investigate if H&H was conducting unauthorized research on inmates without the inmates' informed consent and the consent of the Commissioner.  Plaintiff believed that if this was being done that any such actions were illegal.

**Salary Discrimination: Higher Salary for White Deputy Commissioners at DOC**

139.    Plaintiff learned that white males and females that work at DOC with the same position as Deputy Commissioner have received a higher salary then she does with fewer qualifications. (Maureen Danko, Timothy Farrell, Mike Tausek, Dail Lawrence- No person has 3 Master's Degrees, No person has a combined Doctorate in their area of expertise.  No person authored and was awarded a $250,000 grant to support the work of the Department.

**Retaliation in Response to Plaintiff's Protected Activity**

140.    In November 2018, Chief of Staff, Brenda Cooke, directed the Plaintiff s data team to change

the data that her division, Health Affairs (now reports directly to Brenda Cooke), accumulates and records to match that of HHC so that the Mayor's Office will not ask any questions.  Plaintiff has refused to do so.

141.    This caused Plaintiff tremendous stress and anxiety resulting in Plaintiff having to be under the care of a cardiologist and mental health professional.

142.    After Plaintiff filed her EEOC Complaint, Plaintiff has been marginalized as the Deputy Commissioner of Health Affairs for DOC affecting the ability to perform her job and responsibilities at DOC.

**Defendant Yang's Retaliation Against Plaintiff's EEO and EEOC Complaints**

143.    Since Plaintiff's filing of complaints of discrimination against Defendant Yang, Defendant Yang took steps to alter the conditions of her employment.  Defendant Yang isolated Plaintiff, refused to respond to Plaintiff s requests for resources or answers to certain questions regarding inmates or status or in the alternative, Yang would send a response to another white administrator with the answer rather than communicating directly to Plaintiff causing Plaintiff serious lack of information and making her  job to be more difficult and stressful. No other white executive staff member was treated in this matter by Defendant Yang and condoned by Defendant Jeff Thamkittikasem despite Plaintiff's complaints to him about Defendant Yang.

**Further Retaliation: the Joint Assessment Review**

144.    On June 4, 2018 Plaintiff was asked to attend a Joint Assessment Review (JAR), which is a request by HHC to discuss cases that reflect concerns about service delivery or systems issues, on behalf of the Chief of Staff. These JAR meetings are aligned with the work of the Division of Health Affairs for which Plaintiff is the Deputy Commissioner of Health Affairs.

145.    The Board of Correction (BOC) provides oversight to the Department of Correction (DOC). When HHC is on the agenda to present at a BOC public hearing DOC would receive questions or comments about the content of H&H's presentation.  As Deputy Commissioner of Health Affairs, Plaintiff is responsible to answer those questions regarding H&H issues that they presented during the hearing.

146.    Defendants continued to ignore and isolate Plaintiff, and denied Plaintiff access to the JAR agenda.  On June 8, 2018, after several ignored emails from Plaintiff to HHC and Defendant Yang requesting the agenda items, Plaintiff had to obtain the agenda from "Chelsea" who works in City Hall, but was never provided to her by Defendant Yang per the past practice. This cause tremendous stress and anxiety to Plaintiff and her team.

147.    On June 14, 2018 Plaintiff received the JAR agenda and cases to discuss from the DOC legal Counsel. The agenda stated that the JAR meeting was scheduled for June 20, 2018. This was not sufficient time to prepare and was given to Plaintiff late so that she would be unprepared.

148.    As Deputy Commissioner of Health Affairs, Plaintiff has always been invited to the JAR meetings prior to her filing an EEOC Charge of discrimination against Defendants. Plaintiff no longer is invited nor provided the information to investigate the issues to be discussed at the meetings.

149.    Prior to Plaintiff filing her EEOC Complaint, H&H always shared her BOC agenda items with Plaintiff and she would discuss the concerns and responses with H&H personnel.

150.    Said refusal was intentional by Defendant Yang in order to cause Plaintiff to not be able to respond to the BOC staff and at the Public Hearing regarding her Division at Health Affairs.

**Further Retaliation: Defendants Ignored Plaintiff's Inquiries and Concerns about an Inmate**

**with Positive TB Test; Defendant MacDonald Participated in the Discrimination and Retaliation Against Plaintiff**

151.    On July 5, 2018 Plaintiff was notified that an inmate had tested positive for Tuberculous and potentially exposed people from April 6 to May 6, 2018.  Plaintiff received this notification as part of the duties and responsibilities of her role as Deputy Commissioner for Health Affairs.

152.    Defendant Dr. Ross MacDonald was at all times relevant to this case the Chief Medical Officer for HHC. As such he and DefendantPatsy Yang work closely together.

153.    Defendantr. MacDonald had worked at Riker's Island for at least 10 years.

154.    During recent history Plaintiff's predecessors (Deputy Commissioners for Health Affairs ) were all white men.

155.    Based on observations made by persons in the Department,  Defendant MacDonald freely shared information, was professional, and collaborated with Plaintiff's white predecessor (non medical professional), Eric Berliner, as reported by DOC employees that worked in the office during those times ( namely, Thomas McFall and Roderick Williams).  Dr. MacDonald did not treat plaintiff professionally and collaboratively as compared to her white male predecessor.

156.    On July 6, 2018 Plaintiff had several questions about the reasons that it took three months for H&H to identify this person as positive and make notification to DOC. Plaintiff made these questions known to the Defendant MacDonald and Defendant Yang's unit.

157.    In July of 2018, in response to the important questions raised by Plaintiff about why she was not sooner informed about the inmate with a positive TB test, a concern well within the scope and duties of her role as Deputy Commissioner for Health Affairs,  Defendant MacDonald sent an email to several professional colleagues and supervisors disparaging Plaintiff's character and her job

performance.

158.   Plaintiff, as part of her duties and responsibilities sought input and responses to basic questions which related to timing of events, actions taken and notifications made about this positive Tuberculosis testing by an inmate.

159.   Rather than engage Plaintiff as he had those persons who held Plaintiff's position prior to her being hired Defendant MacDonald he demeaned her and questioned her competency, stating, "I am very concerned that you, as a non-physician and non-public health professional, are making assumptions and allegations that reflect a lack of understanding of the medical and public health underpinnings of exposure, transmission, and treatment of tuberculosis. These are outside your expertise and are plainly wrong, and are unnecessarily alarmist."

160.   While the email request made by Plaintiff simply sought information and included several other persons, Defendant MacDonald's response  this email did not attempt to answer the questions asked by Plaintiff and was not sent to Plaintiff in an attempt to be helpful to Plaintiff as she did her job, but was strategically sent by Defendant MacDonald to a number of high ranking persons in City Government to embarrass her, demean her and cheapen her authority as an African-American woman:

- Heidi Grossman,  Deputy General Counsel (DOC)

- Patricia Feeney, Deputy Commissioner (DOC)

- Fazal Yussuff,  Assistant Commissioner for Health Affairs (DOC)

- Dr. Richard Leinhart,  Chief of Medicine (DOC)

- Angel Villalona, First Deputy Commissioner (DOC)

- Cynthia Brann, Commissioner (Plaintiff's supervisor)

39

-     Peter Thorne,  Deputy Commissioner for Public Information (DOC)

-     Jeff Thamkittikasem,  Chief of Staff (DOC)

-     Brenda Cooke,  Associate Chief of Staff (DOC)

-     Roderick Colandria (HHC)

-     Patsy Yang (HHC)

161.    No such attack or action was taken against his white male counterparts, or with Plaintiff's white male predecessor (non medical professional), Eric Berliner,  but he had no reluctance doing so against Plaintiff.  The action of sending such a statement in an email without attempting to work with Plaintiff was both dismissive and intended to harm Plaintiff.

162.    The email was so offensive that Peter Thorne, Richard Leinhart, Fazal Yussuff, and Patricia Feeney approached the Plaintiff privately to check on her welfare and discussed the hostility and unprofessionalism on the verbal attack.  Dr. Leinhart confirmed that the content of the email and questions asked were reasonable and helpful information to have/know.  All persons shared feelings of disgust and embarrassment on the Plaintiff's behalf.

163.    Rather than attempt to speak with and act respectfully with Plaintiff in her official role, Defendant MacDonald stated, "I have been in contact with my medical colleagues in HMD, who understand the situation as a routine and manageable one." This type of written 'slamming the door in Plaintiff's face' was typical of the ongoing discriminatory and retaliatory refusals of Defendants MacDonald and Yang to work with and include Plaintiff in matters relating to the work she had been hired to do.

164.    Defendants MacDonald and Yang each knowingly engaged in this discriminatory and

40

retaliatory treatment in an attempt to cause harm and injury Plaintiff. This continuing course of treatment created a hostile and unwelcoming work environment and relationship for Plaintiff.

165.     The disrespectful and demeaning behavior was based on and was an act of willful differential treatment which was  discrimination leveled against Plaintiff a  black woman that was performing her job as the Deputy Commissioner for Health Affairs .

166.     This incident, which was consistent with the mistreatment of Plaintiff by Dr. MacDonald, was significant due to the positions and titles of the people on the email chain.  The goal of the email was to single Plaintiff out as an African-American woman Deputy Commissioner and damage her professionally, further hindering her from doing her job effectively.

167.      In his interactions with Plaintiff's prior white predecessors, Defendant MacDonald professionally collaborated with and shared information, and did not email other colleagues to disparage their work or job function.  He did so to with Plaintiff in a departure from his past dealings with white men, because Plaintiff was a Black woman who sought and asked for the same level of respect and professional responsiveness as her white predecessors.

168.     The discriminatory behavior was modeled and supported by Defendant MacDonald's supervisor, Defendant Patsy Yang.

169.     In this incident, which was aimed as an act of hostility against Plaintiff, was another adverse employment action, taken for no good reason, the Defendant MacDonald and Defendant Yang refused to answer Plaintiff's questions.  As a result, Plaintiff was forced to contact the NYC Department of Health and was able to receive the answers and a comprehensive history as to why the DOC was not notified earlier of the Tuberculosis positive test.   No other white or

non-African-American Deputy Commissioners were treated in this fashion. The previous white Deputy Commissioner for Health Affairs, Eric Berliner, was never treated in this fashion.

170.     Plaintiff was subjected to repeated slights and denials of opportunities from which she was blocked or which were then afforded to less qualified white persons.

Plaintiff is Awarded a Prestigious Fellowship: Discrimination and Retaliation Follows

171.     The Plaintiff was recommended for the We Are New York Fellowship in 2016 by the FirsT Deputy Commissioner. She was awarded the Fellowship which was never identified as being inappropriate. In fact, one of the recommendation letters, dated September 2, 2016, came from Dina Simon, First Deputy Commissioner for DOC. As a result of her stellar work representing DOC and the City of New York, at the end of the Fellowship period, the Plaintiff was selected to be an ambassador to Israel for one week on behalf the Fellowship. All expenses for this trip were absorbed by the Fellowship, so there was no financial cost to DOC or NYC.

172.     Once Plaintiff began to complain about her treatment by Defendant Brann, Plaintiff's direct report was changed from Defendant Brann to Angel Villalona, but Defendant Brann continued to make all decisions about Plaintiff's employment.

173.     When the Plaintiff requested to participate in the continuation of the Fellowship work, as a further act of retaliation, the Plaintiff's request was denied. The newly appointed First Deputy Commissioner, Angel Villalona, informed her it was a conflict of interest. However, when the Plaintiff contacted the Conflict of Interest Board, she was advised that this was not a conflict, that she only needed permission from her supervisor. Subsequently, this request was denied. Plaintiff asked Mr. Villalona if he was making the decision that this opportunity was being taken from her, he refused to answer the question and stated "Nichole, you can't go."

**Plaintiff is Requested by the Mayor's Office to Work on Mental Health Issues for the Elderly and Aging:  Defendants Refuse Plaintiff this Honor and Opportunity and Instead Send a Less Qualified White Male**

174.     In or about January of 2019, Plaintiff received an appointment request from the Mayor's Office to work in a small group (Task Force) to address mental health issues for the elderly and aging.   The commitment was a monthly meeting.   This request was denied by Defendant Brann, and DOC sent a less qualified white male, Mike Tausek, instead of the Plaintiff, even thought the request was specifically directed  toward the Plaintiff and her participation. Commissioner Brann named Mike Tausek, who she recruited from Maine.   This was the second time, she gave him opportunities for advancement that were earned and earmarked specifically for the Plaintiff. The first time Brann sent Mike Tausek to replace Plaintiff was January of 2018, in Orlando, Florida in January 2018 - National Organization of Black Law Enforcement (N.O.B.L.E.)

175.     After this opportunity and honor was taken away from Plaintiff, Mike Tausek, delegated this work to his staff.   After several meetings, his staff reached out to the Plaintiff asking her to participate as this work group was clearly more consistent with her skills and expertise.

Defendants Block Plaintiff's Attendance at the NOBLE Conference to Present her Work; Defendant Brann sends a Less Qualified White Male Instead

176.     Plaintiff, a Black female, and another female were supposed to attend an important conference in Orlando, Florida in January 2018 - National Organization of Black Law Enforcement

(N.O.B.L.E.). Plaintiff was the one who authored and designed the mental health segment presentation, and did so based on her skill set and area of expertise. However, in an act of discrimination and retaliation and due to the filing of the EEOC charges, Defendant Brann denied Plaintiff the benefit to travel to the conference and present her own work and a less qualified white male (John Gallagher jail administrator) was told to attend by Defendant Brann (Caucasian). The white male (John Gallagher) never went to Florida despite Plaintiff's availability. Mr. Gallagher, the white male that Defendant Brann asked to present Plaintiff's authored materials, was not qualified as a doctor or mental health expert. This was known and condoned by Defendant Brann, yet she intentionally deprived Plaintiff of this assignment and opportunity.

Defendants Block Plaintiff's Attendance at the ACA Conference to Present her Work; Defendant Brann sends a Less Qualified White Male Instead

177. Plaintiff was the original Presenter/Speaker and was placed on the list of Presenters by the American Correctional Association (ACA). The title of the talk was, 'Roots of Violence: Incorporating a mental health perspective with disruptive individuals in jail.' In the same manner of the aforementioned conference, however, due to the filing of the EEOC charges, Plaintiff was subsequently denied the benefit to travel to the conference and a less qualified white male was told to attend by Defendant Brann (White). Even after the conference organizers reached out to the Defendant Brann and specifically requested the Plaintiff s attendance, Defendant Brann still opted to send a less qualified white male. The white male that Defendant Brann asked to present Plaintiff's authored materials was not qualified as a doctor or mental health expert. This was known by Defendant Brann. These blatant adverse employment actions by Defendant Brann and the NYC DOC have damaged Plaintiff s professional reputation with the ACA and N.O.B.L.E.

178.    In an email dated Friday, December 15, 2017, in an act of discrimination and retaliation Defendant Brann, wrote to Plaintiff and the person with whom she was to present to ACA and stated, "I have communicated directly with ACA rep. Ms. Eferti. Dep. Gallagher will be presenting. Please provide him with the required materials. Thanks"

179.    In an attempt to explain the sudden change of personnel being provided from DOC, and to try and minimize the harm caused to herself and her reputation, once Plaintiff learned of the decision made by Defendant Brann, she, drafted an email to Michael Miskell of ACA and stated, "Our current Commissioner, Cynthia Brann, would like for other team members to have an opportunity to experience and present at ACA.  She has decided to send  Deputy Warden Gallagher, that worked with me on the Mental Observation units and supervised Mental Health housing areas,  to the conference in place of myself and DC Saunders.  He will present the workshop that NYC DOC is scheduled to present and will attend the behavioral health task force meetings for NYC DOC."

180.    This email was yet another attempt by Plaintiff to overcome the discrimination and retaliation to which she was being subjected and to try to maintain her sense of dignity and professionalism.

**Defendants Block Plaintiff's Attendance at Another NOBLE Conference to Present her Work; Defendant Brann sends a Less Qualified White Male Instead**

181.    In April of 2018 Captain Carolyn Lewis, a member of N.O.B.L.E. and employee of DOC, informed Plaintiff that she had approached the Defendant Brann several months prior to ask her to have the DOC submit to N.O.B.L.E. a presentation in the form of a panel discussion that had experts from the agency.  Defendant Brann had originally told her to ask Plaintiff to participate. Plaintiff was initially suggested as a person who could make the presentation and who had the background and knowledge.

45

182.    On April 27, 2018, Plaintiff was told by Captain Lewis at a DOC meeting that she had received an email from Defendant Brann's executive assistant stating that the two African American professionals (Plaintiff and Chief Maxoline Mingo–which later changed to Chief Stukes), would not be able to attend the conference.  When Captain Lewis explained to Defendant Brann's assistant that she had submitted their resumes and names which was how the conference was approved, and that DOC needed to have some of the original panel members participate, the executive assistant responded that Plaintiff would not be approved to attend, but that Chief Stukes could attend per Defendant Brann's directive.

183.    This was a panel discussion to discuss the mental implications, trauma and impact of working in jail.  Subsequently, two less credentialed white males (John Gallagher (white male), no mental health degrees; Michael Tausek (white male), an attorney by training, but no degree in mental health), were selected to attend the conference.

184.    This was retaliatory because originally, Defendant Brann had previously articulated to Captain Lewis that Plaintiff should attend this conference, but that after receiving the EEOC claim, Captain Lewis was not able to have Plaintiff participate on the panel despite being the most qualified.

185.    Defendants' adverse actions against Plaintiff limited her opportunity for professional growth and development and damaged her professional reputation.  N.O.B.L.E. expected Plaintiff to participate in the conference.  It was Plaintiff s resume that assisted in getting the panel workshop included in the conference.  At the prior NOBLE meeting in (February 2018), it was announced that Plaintiff would be attending the conference for the DOC and the organization was very excited that this was the first time that the DOC was presenting at N.O.B.L.E. and would be represented by an

African American female Doctor, along with other professionals of color.

186.    As a result, Plaintiff has been subjected to an act of retaliation by Defendant Brann, stemming from the same National Organization of Black Law Enforcement (N.O.B. L.E.) conference that Plaintiff was originally scheduled to attend, but was replaced by two less credentialed white counterparts in January 2018 by Brann.

187.    Defendants continued to engage in retaliatory acts towards plaintiff that prevent her from completing her current job functions as Deputy Commissioner of Health Affairs.

188.    Defendants have adversely affected Plaintiff s ability to advance and grow professionally within DOC.  DOC has taken opportunities afforded to Plaintiff and earned by her and given them to less qualified white males, which contributed to their professional growth and development.

**Differential Treatment**

189.    Despite Plaintiff's extensive experience and multiple distinctions, Nichole Adams-Flores had her duties and responsibilities reduced by Defendants Brann, MacDonald, Yang, Thamkittikasem, and Murphy, was forced to endure a constant barrage of unwarranted, disparaging comments, critiques, and criticisms from less qualified, non-African American subordinates including Defendants Thamkittikasem, Brann, MacDonald and Murphy, had her authority circumvented and usurped by less qualified, non-African American subordinates at the direction of Defendants Thamkittikasem, Brann, MacDonald, Yang and Murphy, was denied the  personnel and fiscal resources enjoyed  by less qualified, non-African American subordinates, such as Defendants Thamkittikasem, Brann, and Murphy, and was unfairly denied the official designation as Health Service Manager by Defendants Brann and Thamkittikasem.

190.    Plaintiff worked the same extensive hours as her less qualified, non-African American

counterparts, namely Defendants Brann, Thamkittikisem, Murphy and Deputy Commissioners Farrell, Tausek, and was forced to perform substantially more tasks, responding 24 hours a day, than male Deputy Commissioners (Farrell, Tausek, Lawrence) who are non-African American yet she was paid less despite Plaintiff being responsible for the investigations of deaths in DOC (Riker's Island) which required her to be on Call 24 hours a day, 7 days a week.

191.    Not only was Plaintiff forced to endure the circumvention of her authority as Deputy Commissioner, but she was also forced to endure other employment conditions that her non-African American Deputy Commissioners were not subject to. Subordinates in her division were told to report on her activities to the Chief of Department.   Plaintiff was directed to prepare and submit conference proposals that were given to others to receive credit, and Plaintiff was not provided with enough staff and resources to execute the required tasks for which she was responsible.  Each of these acts and others were done intentionally by Defendants, Yang, MacDonald, Murphy, Brann and Thamkittikisem.

192.    Similarly situated non-African Americans were not subjected to such discriminatory conduct and hostile working conditions.

**Defendants Retaliate After Learning of Plaintiff's Filing of this Lawsuit: Revocation of Permanent Appointment, False "Unsatisfactory" Rating, and Termination**

193.    On or about October 30, 2018 DCAS-Director of Civil Service Transactions sent to Plaintiff an email confirming that she was permanently appointed as a Health Service Manager as of September 11, 2017.  This email was in direct response to an inquiry submitted by Plaintiff asking for confirmation that her probation had been served.

194.    On December 24, 2018, Plaintiff filed her Complaint in the Federal District

Court, Southern District of New York which is the instant matter.

195.    On an after December 26, 2018, information about the filing of Plaintiff's lawsuit

was published in the media and the public.

196.    On January 9, 2019, Human Resources sent Plaintiff a letter informing her that

her probationary time was "unsatisfactory" due to circumstances around a Department of

Investigation investigation.

197.    On January 11, 2019 DCAS Deputy General Counsel responded to Plaintiff's

email that she had sent asking for clarification on the policy and procedure relating to the

"unsatisfactory" conclusion on Plaintiff probationary time.  He stated that as Commissioner and

Provisional Psychologist, that she was an "at will" employee and could not serve a probation as a

Health Service Manager.

198.    On January 28, 2019, Plaintiff appealed the decision to the Civil Service

Commission, who denied her appeal and directed Plaintiff to contact DCAS.

199.    On March 15, 2019, Human Resources sent Plaintiff a letter stating in relevant

part that her services as a Provisional Administrative Psychologist were "no longer needed."

200.    Plaintiff's attempts to contact and speak with someone from the Civil Service

Commission were met with a direction to contact DCAS directly.  Plaintiff emailed the DCAS

Commissioner and no response was ever provided.

201.    In terminating Plaintiff, Defendants discriminated and retaliated against

retaliated Plaintiff and denied her the benefits and equal treatment of similarly situated other white

and non-African-American persons who had not protested discrimination.

**Hostile Work Environment**

202.    Every time Plaintiff was passed up for desirable assignments, denied participation to attend

conferences assignments, had her authority marginalized by Defendants Yang, MacDonald, Brann

and  Thamkittikasem,  and denied the rank and prestige that comes with promotions (civil service

title), Plaintiff paid a price and continued to be subjected to a hostile work environment. The Plaintiff

endured humiliation, embarrassment and degradation to otherwise stellar career in Corrections and

**Mental Health Field.**

203.    The conduct by Defendants Yang, MacDonald, Brann and Thamkittikasem was severe and

pervasive that it has created a hostile work environment. Said marginalization of the Plaintiff by

Defendant Yang and condoned by the DOC and Defendant Thamkittikasem, despite Plaintiff s

continuous complaints to her supervisors, has affected the terms and conditions of her employment.

204.    Defendants DOC, Yang MacDonald, Brann and Thamkittikasem marginalized Plaintiff by

excluding Plaintiff from job conversations, assignments and minimized her.  Defendant Yang failed

to respond to Plaintiff's  email requests for information, and created and untenable and hostile

environment while belittling Plaintiff in front of her colleagues and supervisors at meetings.

205.    Plaintiff suffered a powerful emotional toll. Plaintiff devoted significant time and energy into

the DOC and took tremendous pride in her work. However, she has been forced to acknowledge the

humiliating and degrading reality that ultimately, her records of achievement, integrity, and lengthy

years of service mattered less to the DOC than the color of her skin and retaliation for complaining

to EEO, EEOC and Inspector General.

DOC's Treatment of Other African American Employees

206.    The monetary loss that Plaintiff and other African American employees in the DOC suffered

is great. She lost tens of thousands of dollars each year for being paid less than the male white Deputy Commissioners and then was terminated.

207.     There is a stark and unjustifiable under-representation of African Americans in the managerial ranks of the DOC. The pervasively discriminatory environment in which Plaintiff and other African Americans are forced to work has caused her substantial harm and will continue to harm all other African American members of the DOC who are never given the opportunity to be treated in same as other similarly situated individuals.

208.     Plaintiff's efforts to remedy this situation have been met with refraction, abuse, resistance, false charges, untruths, retaliation and indifference, which are in violation of the applicable laws, industry standards and undermine Defendant CITY's and DOC's own Equal Employment Opportunity Policy.

209.     As a result of these unfair and unlawful practices, involving sex/gender discrimination, unequal pay, unfair promotions and retaliation have caused a significant loss of wages, title, benefits, value of retirement, standard of living, esteem and reputation.

## AS AND FOR COUNT I
### (Unlawful Discrimination and Retaliation - Title VII, 42 U.S.C. § 2000e et seq. Against City and HHC)

210.          Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 209 inclusive of this Third Amended Complaint, with the same force and effect as though herein fully set forth.

211.          Defendant City is an employer as defined in Title VII, and at all relevant times herein, employed Plaintiff and is liable under Title VII.

212. The discrimination and retaliation Plaintiff experienced while employed at HHC, in particular the discriminatory treatment accorded her by defendant Yang, continued into Plaintiff's employment at DOC, constituting a continuing violation of Plaintiff's rights under Title VII.

Discrimination in violation of Title VII: Race/Color, National Origin, and Sex/Pregnancy

213.        Defendant City discriminated against Plaintiff in violation of 42 U.S.C. § 2000-e2(a), based upon race and color by denying or delaying promotions, denying opportunities, making false claims and charges against Plaintiff, excluding her from information and access to necessary meetings and details for her to accomplish her job, and/or forcing her to resign, therefore giving her less pay and rank as compared to less qualified, non-African American employees.

214.        DOC continued the ongoing pattern of discrimination against Plaintiff that began when she was employed by HHC and denied reasonable accommodation for her high risk pregnancy by HHC and Defendant Yang, and engaged in protected activity by protesting the denial of accommodation to EEO at HHC.

215.        This discrimination was the result of intentional actions by Defendants, deliberate indifference by Defendants, and/or the result of Defendants subjecting pregnant African American employees like Plaintiff to a negative, disparate, and unequal different level of treatment to which white employees are not subjected, including being deprived of the authority which comes with the position and title held.

216.        Defendant CITY as well as its agents, DOC and HHC, through and by CYNTHIA BRANN, PATSY YANG, ROSS MACDONALD, JEFF THAMKITTIKASEM, and MARTIN MURPHY, and other employees discriminated against the Plaintiff in her employment based on Plaintiff's race, color, national origin and sex/gender in violation of Title VII of the Civil Rights Act

of 1964, 42 U.S.C. § 2000e, as amended.

217.        As a direct result of said acts, Plaintiff has suffered and continues to suffer loss of income.  Plaintiff suffered loss of other employment benefits and continues to suffer distress, humiliation, embarrassment as a result of the differential and discriminatory treatment and hostile work environment.

218.        As a direct result of aforementioned acts, Plaintiff has been deprived of her rights, deprived of her freedoms, physically and mentally harmed.  Plaintiff has been forced to seek redress in the courts rather than capitulating to the previously mentioned abuse, ridicule, and discrimination.

219.        Plaintiff has been subjected to humiliation, ignominy, loss of title/status, untimely removal from her position, and removal from her assignment.  As a result, Plaintiff has experienced a diminution in her quality of life.

220.        Plaintiff was refused status, transfer, benefits, resources and trust awarded to other employees who were similarly situated, excepting the fact that they are not African American women.  Were Plaintiff a white person, rather than a African-American woman, she would not have been subjected to the adverse employment actions, denial of transfer, charges and specification, being placed in the situation of having to fight to save her career and subjected to the intense abuse and humiliation that continues.

221.        Plaintiff has incurred incidental fees/damages, loss of pay, loss of benefits, and other damages/ injuries due to CITY as well as its agents, DOC and H&H, CYNTHIA BRANN, PATSY YANG, ROSS MACDONALD, JEFF THAMKITTIKASEM, and MARTIN MURPHY's unlawful

discrimination.

Retaliation in Violation of Title VII, 42 U.S.C. § 2000e-3(a)

222.　　　　Plaintiff engaged in protected activity by protesting and opposing the unlawful and

discriminatory treatment she experienced at HHC, by participating in a proceeding regarding said

treatment, by reporting said treatment to HHC's EEO Officer, and to DOC, by filing a Charge of

Discrimination with the EEOC, and by filing this lawsuit.

223.　　　　Defendants CITY and HHC, and the individual defendants, knew of Plaintiff's

protected activity.

224.　　　　Defendants took adverse actions against Plaintiff because of her protected

activity, proximate to said protected activity.

225.　　　　Defendants CITY and HHC had no legitimate non-discriminatory or non-

retaliatory reason for their adverse actions against Plaintiff.

226.　　　　Once learning of Plaintiff's protected activity, Defendant CITY as well as its

agents, DOC and HHC, CYNTHIA BRANN, PATSY YANG, ROSS MACDONALD, JEFF

THAMKITTIKASEM, and MARTIN MURPHY retaliated against her by creating and continuing

her harmful placement, depriving Plaintiff of equal and fair pay, isolating  Plaintiff, refusing to

communicate with Plaintiff, denying resources to Plaintiff, excluding Plaintiff from information and

meetings,  subjecting Plaintiff to more and greater charges, and other wrongful actions.

227.　　　　As a direct result of said acts, Plaintiff has suffered, and continues to suffer, loss of

income, loss of wages, loss of benefits, loss of retirement benefits, loss of longevity, loss of status,

loss of opportunities, distress, humiliation, embarrassment, psychological trauma, and damage to her

reputation as alleged in the preceding paragraphs of the within Complaint.

228.     As a result of Defendant City's discrimination and retaliation, and by reason of the foregoing, Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages has been subjected to economic losses and psychological injury, distress, pain, suffering, loss of self-esteem, self-doubt, disgrace, public humiliation, embarrassment, inconvenience, anxiety and frustration, and, thus, has been damaged in excess of five million ($5,000,000.00) dollars, as well as punitive damages, costs and attorney's fees.

### AS AND FOR COUNT II
### (Unlawful Discrimination and Retaliation -New York Executive Law § 296)
### (Against Defendants CITY, HHC, and Yang, MacDonald, Thamkittikasem, and Murphy, as Aiders and Abettors

229.     Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 228 inclusive of this Third Amended Complaint, with the same force and effect as though herein fully set forth.

230.     The acts described above constitute unlawful discriminatory employment practices that violate Section 296 of the New York Executive Law.

231.Defendants Tang, MacDonald, Thamkittikasem, and Murphy aided and abetted the discrimination and retaliation against plaintiff by CITY and HHC, in violation of §296(6) of the Human Rights Law.

232.     Defendant CITY as well as its agents, DOC and H&H, CYNTHIA BRANN, PATSY YANG, ROSS MACDONALD, JEFF THAMKITTIKASEM, and MARTIN MURPHY discriminated against Plaintiff by failing to give her the civil service title in a timely manner and marginalizing her duties and condoning the individual Defendants Yang and Thamkittikasem to retaliate against her due to her race and color, pregnancy and gender.

233.        This discrimination was the result of intentional actions by Defendants, deliberate

indifference by Defendants, and/or the result of Defendants subjecting African American and/or

pregnant and/or disabled employees like Plaintiff to negative, disparate, and unequal treatment to

which white employees are not subjected, including being deprived of the authority which comes

with the position and title held.

234.        As a direct result of said acts, Plaintiff has suffered, and continues to suffer, loss of

income, loss of wages, loss of benefits, loss of retirement benefits, loss of status, loss of

opportunities, loss of title, distress, humiliation, embarrassment, psychological trauma, and damage

to her reputation as alleged in the preceding paragraphs of the within Complaint.

235.        That by reason of the foregoing, Plaintiff has been subjected to economic losses and

psychic injury, distress, pain, suffering, loss of self-esteem, self-doubt, disgrace, public humiliation,

embarrassment, inconvenience, anxiety and frustration, and, thus, has been damaged in excess five

million ($5,000,000.00) dollars, as well as punitive damages, costs and attorney's fee States

Constitution.

## AS AND FOR COUNT III
### (Unlawful Discrimination and Retaliation-N.Y.C. Admin. Code §§ 8-101 et seq.)
### Against All Defendants

236.        Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 235

inclusive of this Third Amended Complaint, with the same force and effect as though herein fully

set forth.

237.        The New York City Administrative Code is explicit that the City Human Rights Law

"be construed liberally for the accomplishment of the uniquely broad and remedial purposes

thereof ' and that exceptions and exemptions "be construed narrowly in order to maximize the deterrence of discriminatory conduct." N.Y.C. Admin. Code § 8-130(a)-(b).

238.    The acts described above constitute unlawful discriminatory employment practices that violate Section 8-107 of the New York City Administrative Code.

239.   The acts described above constitute unlawful retaliation in violation of Section 8-107 of the New York City Administrative Code.

240.    Under this section, commonly referred to as the New York City Human Rights Law, All Defendants, except HHC, unlawfully discriminated against Plaintiff by denying plaintiff reasonable accommodation for her pregnancy and disability, treating plaintiff less well than her non-African American counterparts and/or less well than those who had not protested unlawful discrimination, denying her promotions due to her race, removing her power and authority as supervisors due to her race and color, providing her less resources due to her race and color, and ultimately forcing her to be marginalized due to her race and color, therefore giving her less pay, authority, and/or rank as compared to less qualified non-African American supervisors.

241.    This discrimination and retaliation was the result of intentional actions by Defendants except HHC, deliberate indifference by Defendants except HHC, and/or the result of Defendants except HHC maintaining a policy or practice that has a disparate impact on African American employees, namely a standard-less process that allows non-African American supervisors to retain all power and control, to refuse to promote deserving African American employees, and to relegate African American employees to positions with little to no autonomy.

242.    As a direct result of said acts, Plaintiff has suffered, and continues to suffer, loss of income, loss of wages, loss of benefits, loss of retirement benefits, loss of status, loss of

opportunities, loss of title, distress, humiliation, embarrassment, psychological trauma, and damage to her reputation as alleged in the preceding paragraphs of the within Complaint.

243.        That by reason of the foregoing, Plaintiff has been subjected to economic losses and psychic injury, distress, pain, suffering, loss of self-esteem, self-doubt, disgrace, public humiliation, embarrassment, inconvenience, anxiety and frustration, and, thus, has been damaged in excess five million ($5,000,000.00) dollars, as well as punitive damages, costs and attorney's fee States Constitution.

## AS AND FOR COUNT IV

### (42 U.S.C. §1983 Against All Individual Defendants in their individual capacities)

244.        The Plaintiff repeats, reiterates, and re-alleges each allegation contained in paragraphs 1 through 243 of this Third Amended Complaint with the same force and effect as though fully set forth herein.

245.        All of the acts and conduct of the Individual Defendants, herein stated were done under color of state law, while in the performance of their duties as Supervisors for HHC and the CITY on behalf of DOC.

246.        The facts and circumstances cited above are in violation of Plaintiff s Fourteenth Amendment right under the Equal Protection Clause of the United States Constitution to be free from retaliation, discrimination and harassment in her employment with HHC and DOC.

247.        That Individual Defendants did conspire to violate Plaintiff Constitutional rights by actually depriving her of entitlement to promotions, civil service title in a timely manner, overtime, staffing and to be free of harassment and retaliation within the work place, and other pension rights.

248.      That Individual Defendants did willfully and knowingly manufacture allegations, make false claims against the Plaintiff with the intent of causing Plaintiff to be marginalized and treated in a discriminatory and retaliatory manner.

249.      That Defendants maliciously and vindictively evaluated Plaintiff s performance in a negative matter solely because of her race and color so that she would be denied or negatively impact her ability to perform her duties as a Deputy Commissioner of Health Affairs within DOC.

250.      That despite Defendants' knowledge that Plaintiff was well qualified to perform her responsibilities within DOC they nevertheless forced her to endure the aforementioned employment conditions under duress knowing that she was capable of performing the duties of an executive officer within DOC, Plaintiff was the victim of a hostile work environment at DOC and denied the benefits of working for the DOC like other similarly situated executive white male staff members.

251.      That as a direct and proximate result of the aforementioned conduct of the Individual Defendants, Plaintiff was deprived of her property rights, all in violation of her rights under the Fourteenth Amendment rights to equal protection and due process under 42 U.S.C. §1983 to the United States Constitution.

252.      Defendants CYNTHIA BRANN, PATSY YANG, ROSS MACDONALD, JEFF THAMKITTIKASEM, and MARTIN MURPHY, discriminated against and to retaliate against the Plaintiff in her employment based on Plaintiff's race, color, pregnancy and sex/gender in violation of the Fourteenth Amendment to the United States Constitution.

253.      The Defendants CYNTHIA BRANN, PATSY YANG, ROSS MACDONALD, JEFF

THAMKITTIKASEM, and MARTIN MURPHY made decisions to discriminate against and violate the rights of Plaintiff individually and in collusion with each other.

254.     Defendants CYNTHIA BRANN, PATSY YANG, ROSS MACDONALD, JEFF THAMKITTIKASEM, and MARTIN MURPHY, as state actors, acting under color of law, proximately caused the deprivation of Plaintiff's federally protected rights, secured by the Fourteenth Amendment.

255.     Specifically, Defendants CYNTHIA BRANN, PATSY YANG, ROSS MACDONALD, JEFF THAMKITTIKASEM, and MARTIN MURPHY, deprived Plaintiff of the equal protection of the law, refused to grant job status and allow her the same benefits and provide protections against harm, forced her to perform under adverse and different conditions and manipulated the employment relationship and system to deny Plaintiff rights and options provided to other non-African-American persons knowing that doing so was causing Plaintiff irreparable harm, commenced false charges against Plaintiff in violation of the Fourteenth Amendment.

256.     Plaintiff was also denied reassignment without due process because of her race, color and pregnancy, sex/gender, and making complaints in opposition to discriminatory treatment in violation of the Fourteenth Amendment.

257.     As a direct result of said acts, Plaintiff has suffered, and continues to suffer, loss of income, loss of wages, loss of benefits, loss of retirement benefits, loss of status, loss of opportunities, loss of title, distress, humiliation, embarrassment, psychological trauma, and damage to her reputation as alleged in the preceding paragraphs of the within Complaint.

258.     That by reason of the foregoing, Plaintiff has been subjected to economic losses and

psychological injury, distress, pain, suffering, loss of self-esteem, self-doubt, disgrace, public humiliation, embarrassment, inconvenience, anxiety and frustration, and, thus, has been damaged in excess of five million ($5,000,000.00) dollars, as well as punitive damages, costs and attorney's fees.

## PRAYER FOR RELIEF

Plaintiff requests judgment as follows:

a.      First Cause of Action: in excess of five million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

b.      Second Cause of Action: in excess of five million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

c.      Third Cause of Action: in excess of five million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

d.      Fourth Cause of Action: in excess of five million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

e.      Attorney's fees and costs, pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 2000e-5(k) and other fee and costs statutes including the New York City and New York State Human Rights Laws;

f.      A declaratory judgment stating that Defendants wilfully violated Plaintiff's rights secured by federal and state laws as alleged herein

g.      Injunctive relief: an injunction requiring Defendants to correct all present and past violations of federal and state law as alleged herein; to enjoin the Defendants from continuing to act in violation of federal and state law as alleged herein; and to order such other injunctive relief as may

be appropriate to prevent any future violations of said federal and state laws; and

   h.  An Order granting such other legal and equitable relief as the court deems just and

proper.


    PLAINTIFF DEMANDS A TRIAL BY JURY


Dated: Hempstead, New York
   July 24, 2020     LAW OFFICES OF
            FREDERICK K. BREWINGTON

       By: _____
         FREDERICK K. BREWINGTON
         Attorneys for Plaintiff
         556 Peninsula Boulevard
         Hempstead, New York  11550
         (516) 489-6959